**HEALTH SERVICES MANAGEMENT
CORP., Petitioner–Appellant,**

v.

**Charles HUGHES, d/b/a Charles Hughes
& Associates, Respondent–Appellee.**

No. 91–3380.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1992.
Decided Sept. 17, 1992.

Kenneth J. Heinz (argued), David P. Oetting, Curtis, Oetting, Heinz, Garrett & Soule, Clayton, Mo., for petitioner-appellant.

David A. Rolf (argued), Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, Ill., for respondent-appellee.

Before MANION and KANNE, Circuit Judges, and LEE, District Judge.[1]

WILLIAM C. LEE, District Judge.

This is an appeal from a district court order confirming an arbitration award for Charles Hughes, d/b/a Charles Hughes & Associates and denying an Application to Vacate the Arbitration Award against Health Services Management Corporation.

## BACKGROUND

On May 21, 1987, Hughes and the Health Services Management Corporation (hereinafter "HSM") entered into a written agreement whereby Hughes agreed to perform architectural services for HSM for a long-term care facility. Pursuant to the terms of the contract, HSM was to compensate Hughes a set percentage of the construction cost of the facility, with periodic payments to be made in proportion to progress achieved on the project. The contract contained a clause which provided that claims or disputes arising out of the contract were to be decided by arbitration in accordance with the American Arbitration Association (hereinafter "AAA") Construction Industry Arbitration Rules. The clause further provided that a judgment may be entered by a court of competent jurisdiction upon an award made pursuant to the arbitration.

A dispute arose out of the contract, and a demand for arbitration was filed on April 6, 1990. The demand stated that the owner had failed or refused to make payment for work performed by the architect pursuant to the contract. The relief sought was "payment of contract price plus interest as provided therein." Thereafter, the parties proceeded to arbitration. Names of proposed neutral arbitrators were provided by the AAA and the parties selected as neutral arbitrators Messrs. Tobermann, Walton and Feldman, all from Springfield, Illinois. Statements of the claims were provided prior to hearing. A pre-hearing conference was held on September 28, 1990, where counsel for both parties and all three arbitrators were present.

Messrs. Tobermann and Walton had notified AAA that they knew Mr. Hughes at the time their names were included on the list of potential arbitrators. Prior to the September 28th conference, the AAA did not advise counsel for HSM that Messrs. Tobermann and Walton had previous business relationships with Hughes. At the September 28th conference, HSM's counsel did not inquire of the arbitrators as to any potential conflicts of interest. However, on the first day of hearings (January 16, 1991), counsel for HSM asked whether any of the persons who were selected as neutral arbitrators had any conflict of interests with the parties.

Mr. Walton told counsel for HSM that he had communicated to AAA that he knew Mr. Hughes for a number of years as being a local architect in town, and that he had worked in the same office that Walton had worked in approximately 20 years before. Moreover, he reported that he saw Hughes approximately once a year since Hughes had left the architecture firm. Mr. Tobermann told counsel for HSM that he had disclosed in his statement to AAA that Hughes had worked for the firm Tobermann was with one summer several years before, and that he had seen Hughes about twice in the past four or five years at various meetings. Both Tobermann and Walton indicated that they did not believe that their prior relationship with Hughes would have any prejudicial effect in their sitting as arbitrators.

Counsel for HSM indicated that he had not been advised by the St. Louis office of the AAA of these particular disclosures. Following this exchange, Arbitrator Feldman announced that if either party wanted to place any objections on the record, they should do it that time. Counsel for HSM stated that he would have to rely on the statements of Walton and Tobermann that the prior relationship with Hughes would not have a prejudicial effect.

1. The Honorable William C. Lee of the United States District Court for the Northern District of Indiana, sitting by designation.

Two days of hearings were held on January 16 and 17, 1991. Thereafter, counsel for HSM confirmed by telephone on January 22, 1991, with the AAA in St. Louis that it had not previously disclosed these relationships. Following that conversation, HSM again proceeded with the arbitration in this matter by participating in a scheduling conference on February 25, 1991, during which time both counsel for HSM and counsel for Hughes were present as well as all three arbitrators. During this scheduling conference, HSM failed to voice any objection to the disclosures by the arbitrators, nor to the nondisclosure by AAA. HSM and Hughes agreed to the scheduling of a third day of arbitration on March 22.

On March 21, 1991, HSM submitted its Motion for New Trial and Memorandum in Support Thereof alleging that HSM had been biased and prejudiced in the proceedings by several events: (1) AAA had failed to advise HSM of the prior relationships that existed between each of the two arbitrators and Hughes; (2) that at one point during the cross-examination of the claimant, Hughes had been directed to a particular section of the contract so as to coach the witness to a particular answer, and; (3) HSM had been prevented from making a motion for a directed verdict or summary judgment and that the Chairman had indicated that the motion would be denied before the other two arbitrators had the opportunity to hear the motion.

On March 22, 1991, the arbitrators overruled HSM's motion and continued to hear the claim. The panel entered their award on April 15, 1991, granting Hughes $11,427 on his claim and denying HSM's claim for damages. Thereafter, on June 14, 1991, HSM filed its Application to Vacate Arbitration Award under 9 U.S.C. § 10 with the United States District Court for the Central District of Illinois, Springfield, Illinois. HSM asserted that the award was procured by undue means, evident partiality, or misbehavior by which the rights of HSM were prejudiced, alleging that (a) the AAA's failure to advise HSM's counsel of the prior relationships between Hughes and Arbitrators Walton or Tobermann was in violation of Rule 19 of the applicable arbitration

rules; (b) the evident partiality of the arbitrator; and (c) that the award was contrary to law in that Hughes' claim was grounded in contract, not *quantum meruit* and that thus, the arbitrators award was erroneously entered in an amount of damages not supported by any claim in the case. HSM's application was not accompanied by any Memorandum of Law and neither did HSM attach any exhibits or copies of the transcript to its application, nor request oral argument.

Thereafter, on June 28, 1991, Hughes filed a Memorandum in Response to HSM's Application and a Motion for Judgment upon the arbitration award. Accompanying said Memorandum in Response were copies of pages 10, 11, 12, 13, 50, and 454–455 of the transcript, a copy of the Award of Arbitrators, and a copy of the Agreement between Hughes and HSM. On July 19, 1991, HSM filed its Response to the Motion for Judgment upon the arbitration award, which included no attached pages but referred to its Application to Vacate Arbitration for reasons why Hughes' Motion for Judgment on Arbitration Award should be denied.

Thereafter, without notice or hearing, pre-trial or scheduling conference, the district judge entered his order on September 13, 1991, denying the Application to Vacate the arbitration award and granting judgment in Hughes' favor. In this Order, the district court erroneously found that HSM did not make any objection after being apprised of Arbitrators Walton and Tobermann's disclosures, when, in fact, HSM did make a written objection on March 21, 1991. Thereafter, HSM filed its Motion to Reconsider Order and Judgment, copies of the transcript of the arbitration hearing, and its written objection it filed with the arbitrators. The only additional pages of the transcript that HSM filed with the court that Hughes had not already submitted were pages 195 and 196, dealing with HSM's allegations that Arbitrator Feldman had improperly directed Hughes to an answer. By Order dated October 4, 1991, filed with the Clerk of the district court on October 7, 1991, the district court denied

the Motion to Reconsider and denied HSM's request for oral argument. Thereafter, the district court entered a new Order on October 9, denying HSM's Motion to Reconsider.

On appeal, HSM contends that the district court erred in entering its order denying Appellant's Application to Vacate Arbitration Award and granting Appellee's Motion for Judgment on Arbitration Award without granting Appellant process under Rule 16 of the Federal Rules of Civil Procedure. Specifically, HSM argues that the district court should have (a) held a scheduling or pretrial conference; (b) ordered briefs to be filed; or (c) ordered the transcripts of the arbitration hearings to be filed. Further, HSM appeals arguing that the Court erred in denying Appellant's Application to Vacate Arbitration Award and granting Appellee's Motion for Judgment on arbitration award because the transcript and record show that the award was procured by undue means, misbehavior or evident partiality. Finally, HSM alleges that the Court erred in denying its application to vacate and granting Hughes motion for judgment because the arbitration award shows manifest disregard for the law and a lack of fundamental rationality in awarding damages logically attributable solely to *quantum meruit* when the arbitration proceeding was based solely on the contract.

## DISCUSSION

### A. *Applicability of Rule 16*

■ Appellant HSM contends that it was effectively denied an opportunity to brief and argue its case before the United States District Court for the Central District Of Illinois. HSM submitted its Application to Vacate Arbitration Award on June 14, 1991, and Appellee, Hughes, filed its Response to HSM's Application to Vacate and its own Motion for Judgment on Arbitration Award on June 28, 1991. HSM next filed its Petitioner's Response to Hughes' Motion for Judgment. At the time that the district court rendered its decision on September 13, 1991, in favor of Hughes' Motion for Judgment and denying HSM's Application to Vacate, all it had before it were

the above mentioned filings plus the Agreement that Hughes and HSM had entered into in 1987, a copy of the signed Arbitration award, and several pages of transcript that Hughes had submitted along with its Response to HSM's Application to Vacate.

HSM contends that Rule 16 of the Federal Rules of Civil Procedure applied and that it was awaiting notice of a scheduling conference or scheduling order whereby time limits would be prescribed for the submission of motions, completion of discovery, an opportunity to file briefs, schedule a hearing, etc. According to HSM, it was reliance on the process of Rule 16 combined with the prescriptions of Local Rules 17 and 18 that caused it not to submit a more complete record at the time it filed its Application to Vacate the Arbitration Award. Furthermore, HSM argues that the transcripts were not even on file when the district court filed its Order dated September 13, 1991.

However much HSM believes that it was entitled to the provisions of Rule 16, an examination of statutory and case law and the Federal Rules themselves does not support this belief. Rule 1 of the Federal Rules of Civil Procedure states:

These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, *with the exceptions stated in Rule 81*. They shall be construed to secure the just, speedy, and inexpensive determination of every action. (Emphasis added)

Rule 81(a)(3) goes on to state in relevant part:

In proceedings under Title 9, U.S.C., relating to arbitration [the Federal Arbitration Act] ... these rules apply only to the extent that matters of procedure are not provided for in those statutes.

Section 6 of the Federal Arbitration Act provides:

Application heard as motion

Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hear-

ing of motions, except as otherwise herein expressly provided.

Thus, the language of Section 6 preempts the applicability of the Federal Rules and an Application to Vacate is to be treated procedurally in the manner of a motion. *See O.R. Securities v. Professional Planning Association*, 857 F.2d 742, 748 (11th Cir.1988) (Rules of notice pleading do not apply to proceeding to vacate an arbitration award, as all relief must be sought in the form of a motion); *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 931 (11th Cir.1990) (Rules of procedure provided in Federal Arbitration Act govern proceedings under Act, and it is only where Act is silent that Federal Rules of Civil Procedure become applicable).[2]

■ It is apparent, then, that the district court did correctly treat the filings of the parties as a motion. As such, when a claim of partiality as to an arbitration award is made, the court is under an obligation to scan the record to see if it demonstrates evident partiality on part of the arbitrators. *Saxis S.S. Co. v. Mulifacs Intern. Traders, Inc.*, 375 F.2d 577, 581–582 (2nd Cir.1967); *Ballantine Books, Inc. v. Capital Distributing Co.*, 302 F.2d 17, 21 (2nd Cir.1962) (Based upon court's own reading of the transcript, record of arbitration proceeding did not disclose that chairman's conduct of hearing evidenced partiality).

However, it is clear from the record that the district court did *not* have the complete record before it when it rendered its Order of September 13, 1991. If it had, then it would clearly have seen that HSM had submitted a written motion objecting to the continuation of the arbitrators, such motion being orally argued at the March 22, 1991, hearing date. Moreover, not all of the relevant transcript was before the district court at this time. The question is whether the district court satisfied the requirement to consider adequately the record in handing down its October 8, 1991, Order pursuant to HSM's Motion to Reconsider.

The district court found in its Order, pursuant to HSM's Motion to Reconsider, that it had not reviewed all relevant pages of the transcript of the record, including HSM's written objection, at the time it ruled on HSM's Application to Vacate because Petitioner (HSM) did not make them available as part of the record.[3] *See* Order, October 4, 1991, at 8. (Appendix to Appellant's Brief, pp. 101–113 hereinafter "Appendix") The standard of review that the district court must render in examining "the record" must be seen in light of the purpose of a court's function in confirming or vacating an arbitration award.

It would defeat the purpose of arbitration if a reviewing court was obligated to give all the due process owed to parties filing actions of a civil nature and deserving of Federal Rule 16 treatment, e.g., a scheduling conference, hearing, etc. Thus, "the court's function in confirming or vacating an arbitration award is severely limited. If it were otherwise, the ostensible purpose for resort to arbitration, i.e., avoidance of litigation, would be frustrated." *Booth*, 902 F.2d at 932 (quoting from *Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp.*, 274 F.2d 805, 808 (2nd Cir.1960)).

However, it is clear that the court must still adequately consider "the record", which would at least include portions of the

---

**2.** We are puzzled why neither party brought to the district court's attention the relevance of Federal Rule 81(a)(3) or the applicability of 9 U.S.C. § 6.

**3.** While the district court Judge did have an obligation to scan the record for alleged instances of "evident partiality" or other arbitrator misconduct, the court did make a valid criticism that the Petitioner, HSM, did not supplement its Application to Vacate with any memorandum or other briefing, or request for a hearing. Since the Application to Vacate is to be treated as a motion, it behooves the moving party, as a practical matter, that it should provide the Court with all matters that it desires the Court to consider in support of Petitioner's Application to Vacate. This is all the more true considering that the burden of proof as to a claim of bias or evident partiality rests upon the party asserting the claim. *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268 (2nd Cir.1971). Apparently HSM's confusion that it was entitled to Federal Rule 16 treatment may be an explanation as to why it did not submit transcripts, etc.

transcript that contain the alleged instances of evident partiality or other misbehavior, and any written submissions in the form of objections, affidavits, etc. by the parties. When HSM submitted its Motion to Reconsider on September 27, 1991, it did, in fact, include a copy of the AAA Construction Industry Arbitration Rules, a copy of its original March 21, 1991, Motion for New Trial submitted before the arbitrators, the affidavit of its counsel, David P. Oetting, the pages of the transcript which it believed evidenced the instances of partiality or misconduct it alleged, including pages 195 and 196 that had not been previously submitted by Hughes, and a copy of the employment agreement between Hughes and HSM.

Therefore, we find that the district court did have before it, pursuant to the Motion to Reconsider, HSM's filings and it did adequately consider the record. The district court sufficiently dealt with all issues raised by HSM in its October 8, 1991, Order. Although we believe that Judge Mills did undertake an adequate review, we take this opportunity to render a more substantive review due to the complexity of the issues and the failure of both parties to address relevant case law and controlling rules in their briefing of the case before the district court.[4]

## B. Compliance with AAA Rules and Issue of Waiver

■ According to Rule 13 of the AAA's Construction Industry Arbitration Rules,

[i]f the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: immediately after the filing of the demand or submission, the AAA shall submit simultaneously to each party to the dispute an identical list of names of persons chosen from the panel.

Each party to the dispute shall have ten days from the mailing date in which to cross off any names objected to, number the remaining names in order of preference, and return the list to the AAA.... From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to service....

See Appendix, at 58–59.

Under Rule 13, the parties had the opportunity to make a peremptory strike (without showing cause) against any person on the list. Moreover, Rule 19 makes it clear that the AAA has an obligation to divulge to the parties any information given by an appointed neutral arbitrator which reveals any partiality, bias, or financial or personal interest, and that under Rule 12 any neutral arbitrator appointed shall be subject to disqualification for any of these reasons. Rule 19 states in part:

**19. Disclosure and Challenge Procedure**

Any person appointed as neutral arbitrator *shall* disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Upon receipt of such information from the arbitrator or another source, *the AAA shall communicate the information to the parties* and, if it deems appropriate to do so, to the arbitrator and others.[5] (emphasis added).

See Appendix, at 59.

Thus, under Rule 19 the AAA has *no* discretion in determining whether to com-

---

**4.** Even if we find that the district court had not properly considered the record pursuant to its Order of October 4, 1991, the Court of Appeals would not be required to remand the case back to the district court but could determine HSM's claims on its own. *See Mobile Oil Corp. v. Local 8–766, Oil, Chemical & Atomic Workers International Union,* 600 F.2d 322 (1st Cir.1979) (Failure of district court, on motion by employer to vacate arbitrator's award, to make independent

determination as to the arbitrability of the underlying dispute did not require remand since the Court of Appeals could itself resolve the question of law as to whether the dispute was arbitrable).

**5.** According to the attorney for HSM, he was initially told by the AAA that the reason why he was not informed of the information conveyed to it by both Messrs. Walton and Tobermann

municate to the parties any information it has received from an appointed neutral arbitrator as to potential impartiality, bias, or financial or personal interest to the parties. In other words, it was not sufficient for the AAA to take the position that *it* weighed the disclosures by Walton and Tobermann and concluded that such disclosures did not affect the eligibility of the proposed arbitrator, or that it was up to the arbitrators to disclose any information at the preliminary hearing or conference.[6] *See Rogers v. Schering Corporation,* 165 F.Supp. 295 (D.C.N.J.1958); *aff'd,* 271 F.2d 266 (3rd Cir. 1959). In *Rogers,* the court held that the fact that the AAA had weighed disclosure of the prospective replacement arbitrator and concluded that his eligibility was not affected was an insufficient reason for failing to advise the parties of the arbitrator's disclosure, in that parties should not have been deprived of at least, the opportunity to convince appointing authority of desirability of selecting another arbitrator. *Id.* at 300.

Thus, had HSM not learned about the previous business relationships between Hughes and arbitrators Walton and Tobermann at the January 16th hearing and had an opportunity to object, then the AAA's failure to disclose the existence of the prior relationship would clearly be the basis upon which to vacate the arbitration decision. *See Commonwealth Coatings Corp. v. Continental Cas. Co., Puerto Rico,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). In *Commonwealth Coatings,* the

Supreme Court held that even though a supposedly neutral member of the arbitration panel, who was appointed in the dispute between a subcontractor and the prime contractor, was not alleged to have been guilty of any fraud or bias in deciding the case, where neither the arbitrator or prime contractor disclosed to the subcontractor the close financial relations that had existed between the prime contractor and the arbitrator for a period of years, the subcontractor was entitled to have the award set aside. *Id.,* 393 U.S. at 148, 89 S.Ct. at 339.

■ But unlike counsel in *Rogers v. Schering Corporation,* a case having a fact situation very similar to the one at hand, Mr. Oetting, attorney for HSM, did not make a timely objection to either Mr. Walton or Mr. Tobermann remaining as arbitrators in the hearing. In *Rogers,* a replacement arbitrator, Mr. Fanto, was selected to fill the vacancy on an arbitration panel. Mr. Fanto disclosed to the AAA that he had had one prior business relationship with the Schering Corporation, but the AAA did not disclose this prior business relationship to the other party named Hexagon Laboratories, Inc. When Hexagon Laboratories did learn about this prior business relationship, a day of hearings with Fanto as a member of the arbitration panel had already passed. However, at the very next hearing day, counsel for Hexagon Laboratories obstreperously objected to Fanto continuing as an arbitrator.[7]

---

was because the AAA thought the relationships were so nominal as to be not worth mentioning. *See* Affidavit of David P. Oetting, Appendix, at 71–73.

6. The AAA clearly violated its own Rule 19, which states in part:

> Any person appointed as neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Upon the receipt of such information from the arbitrator or another source, *the AAA shall communicate the information to the parties* ... [emphasis added].

Rule 19 does *not* say that it is the responsibility of the arbitrators to disclose this information to the parties.

7. Counsel made clear his objection to Fanto's presence on the arbitration panel upon learning of the prior relationship:

> "I state unequivocally that if I, as the attorney for the claimant, were aware of the facts as previously outlined, [and] these facts had been communicated to me, I would under no circumstances have waived these facts and would have objected to Mr. Fanto's sitting as an arbitrator....
>
> "I must go a step further. In the informal discussion we had off the record, I disclosed practically what I have said now to the arbitrators and to Mr. Fanto. I indicated that I was an advocate, and it was suggested that I request Mr. Fanto, under the circumstances, to resign or disqualify himself. And he said he saw no reason to do so, and did not do so. This only multiplies my concern ..."

*Schering Corporation,* 165 F.Supp. at 301–02.

In the instant case, however, the attorney for HSM did not raise an objection, when given the chance, once he was informed of Messrs. Walton and Tobermann's prior business relationships with Hughes.[8] The transcript clearly reflects this:

> Arbitrator Feldman: Any other preliminary matters that either counsel have?
>
> Mr. Oetting [counsel for HSM]: I don't know what the AAA's file shows, but I'd ask each of the arbitrators to state for the record they have no conflict of interest with Mr. Hughes' relationship ...

> \* \* \* \* \* \*

> Arbitrator Feldman: [Indicates he did not know Mr. Hughes prior to the hearing and doesn't know anyone from HSM.]
>
> Arbitrator Walton: As I stated when I was asked to be an arbitrator, I considered I knew Mr. Hughes for a number of years as being a local architect in town. I know most of the architects in town. And Charles worked in the office that I worked in 20 years ago, or so. That was made part of the record in the beginning.
>
> Mr. Oetting: It wasn't disclosed to us, but that's why I wanted to—
>
> Arbitrator Feldman: Yeah.
>
> Arbitrator Walton: I made that known to the arbitration board at the time that they asked me to serve. I said I had no problems—no contact. We don't see each other very much, maybe once a year, or so. That's about the extent of it since—since he left the firm that we were both together with.
>
> Mr. Oetting: And I take it in your own judgment that your prior relationship with him wouldn't have a prejudicial effect one way or the other?
>
> Arbitrator Walton: I don't believe so, no.
>
> Mr. Oetting: Okay.
>
> Arbitrator Tobermann: I disclosed, also, in my statement to the AAA that

> Chuck had worked for our firm one summer years ago. I don't have any idea how long ago it was. I suppose I've seen Chuck maybe twice in the last four or five years at A.I.A. meetings, and so forth. I don't believe I have any prejudice one way or the other.
>
> I don't know anyone from your organization or you. And that was—everything I've just said was disclosed.
>
> Mr. Oetting: Yes. And that's why I asked the question, because we never heard that from the administrative office.
>
> Arbitrator Tobermann: I'm surprised the disclosures weren't made, because I've made them in the past and have been eliminated because of knowing people.
>
> Arbitrator Feldman: I've made the disclosures, as well. I'm surprised you didn't get the statements. But to be honest with you, this is the first time I've worked through the St. Louis office rather than the Chicago office.
>
> Arbitrator Tobermann: Me, too.
>
> Arbitrator Feldman: Just as fees are worked differently through St. Louis than through Chicago, as I found out yesterday—
>
> Mr. Oetting: Oh, yes.
>
> Arbitrator Feldman: That's fine. And if anybody wants to place any objections on the record, they should do so now.
>
> Mr. Oetting: Uh, I'll have to rely on the statements that have been made, which is what I assume you said more or less in the disclosures, that it would have no prejudicial effect.

*See* Appendix, at 17–20.

In construing this colloquy, it is evident that counsel for HSM, when he learned of the prior relationships between Hughes and arbitrators Walton and Tobermann, did not object to the two men remaining as arbitrators on the panel. Clearly, he had a right to object under AAA's Rule 19, but

---

**8.** Counsel for HSM did not raise an objection until March 21, 1991, immediately prior to the third day of hearings and more than two months after he learned about the prior relationship between Hughes and arbitrators Walton and Tobermann. *See* Motion for New Trial and Memorandum in Support Thereof, Appendix, 67–70.

he chose not to. Counsel for HSM accepted that what Walton and Tobermann had told him on the morning of January 16 was what they had disclosed to the AAA and he further accepted their opinions that their prior relationships with party Hughes would have no prejudicial effect.

Furthermore, Rule 38 of the AAA's Construction Industry Arbitration Rules states explicitly that a waiver of the rules occurs if a written objection is not submitted after learning about a non-compliance.

### 38. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection thereto in writing shall be deemed to have waived the right to object.

*See* Appendix, at 62.

HSM argues that it did make a timely written objection, that being on March 21, 1991, the day before the third day of the hearing scheduled on March 22. *See* Appendix, at 67–70. However, at this point two days of the hearing had already occurred, resulting in several hundred pages of transcript. Moreover, more than two months had passed since counsel for HSM had learned about the prior relationships between Hughes and arbitrators Walton and Tobermann. Finally, counsel for both Hughes and HSM had attended a scheduling conference on February 25, 1991, in which all three arbitrators were also present. HSM did not bring up its objection at this time either. It waited until March 21, the day before the final day of the scheduled hearing.

The Court of Appeals for the Second Circuit has recently dealt with the very issue of when a timely objection must be brought in the case of *York Research Corp. v. Landgarten*, 927 F.2d 119 (2nd Cir.1991). In *York*, counsel for York Research Corporation had struck ten of the fourteen names submitted to it by the AAA for the purpose of comprising an arbitration panel. Two of the ten potential arbitrators that York's attorneys had initially struck were later included on the arbitra-

tion panel. AAA had sent letters to York's attorneys informing them that these two had been added but York registered no objection. After two days of hearings before the panel had transpired and twenty-three days after the first day of hearings, York registered its objection to the inclusion of the two previously struck arbitrators remaining on the panel. The Second Circuit held:

York argues further that its objection was timely because it was made before the arbitration panel issued its award. However, the most natural meaning of the word "proceeds" in Commercial Rule 38 encompasses participation in the formal arbitration proceeding at any stage. *We thus hold that Rule 38 requires that an objection based on facts known before the beginning of the arbitration proceeding may not be raised after the proceeding begins. York clearly participated in that proceeding knowing the facts on which its belated objection was based.* (emphasis added).

927 F.2d at 122.

Likewise, counsel for HSM knew before proceeding with the arbitration hearing on January 16, 1991, that arbitrators Walton and Tobermann had prior business relations with Hughes. It is acknowledged that Mr. Oetting, counsel for HSM, was placed in a difficult situation when he learned of the potential conflict just moments before the substantive part of the hearing was to begin. At this point, he had at least three options: (1) to object and pick up and leave, filing his formal written objection with the panel and AAA; (2) to object and, if the objection was overruled, to proceed with the hearing, or; (3) to waive his right to object and proceed, accepting the arbitrators' opinions that, as indicated in the record, their prior business relationships with Hughes would not have a prejudicial effect.

Obviously it would have been a great inconvenience to Mr. Oetting and his witnesses at the time they learned of arbitrators Walton and Tobermann's potential bias to pack up and go back to Missouri at that point. Thus, option one may not have been

a very attractive choice, however much theoretically it was available to HSM. However, at HSM's request the arbitration panel would have been obligated to grant a postponement of the hearing or risk having their award vacated under 9 U.S.C. § 10(c).[9]

Even if counsel for HSM did not know that he had a right to a postponement of the hearing, he should have at least objected on the record, with the knowledge that he might be overruled and the hearing continued despite his objection.[10] This would have preserved his timely objection for purposes of the court's review of the Application for Vacation. *See San Carlo Opera Co. v. Conley*, 72 F.Supp. 825 (S.D.N.Y. 1946); *aff'd*, 163 F.2d 310 (2nd Cir.1947). In *San Carlo Opera Co.*, the district court held that where the party to an arbitration made a timely objection to two of the arbitrators on the grounds of bias before the arbitrators and before the administrator under the AAA's rules, and such objection had been overruled, he should proceed with the arbitration pursuant to the terms of the contract. He will thus exhaust his remedies within the rules of the Association, but he will not be precluded from reasserting his objection, if necessary, when confirmation of the award of arbitrators comes before a proper judicial tribunal. *Id.*, 72 F.Supp. at 833.

As it happened, counsel for HSM explicitly stated on the record that he relied on the disclosures of Walton and Tobermann that their prior business contacts would have no prejudicial effect. He then waited until more than two months later to file a written objection.[11] By this time two days of hearings and a scheduling conference on February 25 for a third day of hearings had occurred without objection. At this point, significant time and expense had been expended on the part of the parties and the arbitrators as well. Thus, although HSM had an absolute right to make a preemptory strike of any of the arbitrators, it had to exercise such right in a timely fashion or lose it.

Obviously AAA's Rule 38 was adopted in an attempt to resolve problems of this kind, and the courts have been willing to recognize that a party can waive its right to object. *See e.g., York Research Corp.*, 927 F.2d at 122; *Gibbons v. United Transp. Union*, 462 F.Supp. 838, 842 (N.D.Ill.1978) (Defects in proceedings prior to or during arbitration may be waived if a party acquiesces to arbitration with knowledge of defect); *Catz American Co., Inc. v. Pearl Grange Fruit Exchange*, 292 F.Supp. 549, 552–53 (S.D.N.Y.1968) (Where Michigan

9. Section 10(c) states in part that "the United States court in and for the district where the award was made may make an order vacating the award upon the application of any party to the arbitration ... Where the arbitrators were guilty of misconduct *in refusing to postpone the hearing, upon sufficient cause shown*, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." (emphasis added).

10. This is what the attorney did in *Rogers v. Schering Corporation*, a very similar case on the facts to the instant case. As soon as counsel for Hexagon Laboratories, Inc. learned of the potential bias from a source other than the AAA, he conveyed his information immediately to the Tribunal Clerk and objected to the arbitrator continuing to act at the next hearing. At that time he also requested that such arbitrator resign. When the arbitrator refused to resign and he was defended in his action by the Chairman of the arbitration board, the arbitration hearing continued. However, the district court vacated the award on grounds that the original objection

made by Hexagon's counsel was not made too late. *See id.*, 165 F.Supp. at 301–02.

11. According to HSM's counsel, Mr. David P. Oetting, he contacted AAA on January 22, 1991, about the two arbitrators' prior relationship with Charles Hughes and was first informed that AAA had reviewed the disclosures of Messrs. Tobermann and Walton and determined that the relationships were remote enough so as not to require disclosure and that such information had not, therefore, been transmitted to either party or their counsel. He then states that he received a second telephone call that day and was informed that the earlier information he had received was incorrect. Rather, AAA indicated that the prior relationships between Hughes and Tobermann and Walton were supposed to be disclosed at the preliminary conference. When Mr. Oetting indicated that they were not, he was informed that if he was going to take any action it was suggested that he do it sooner rather than later. *See* Affidavit of David P. Oetting, Appendix, at 71–73.

corporation did not object to method of appointment of substitute arbitrator and at time of arbitration, even though Michigan corporation knew that New York corporation and arbitrators had close personal relations, federal district court in hearing under Federal Arbitration Act would not vacate award at request of Michigan corporation on grounds that arbitrators were partial); *accord Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir.1987); *Arbitration: Ilios Shipping and Trading Corp. and American A. & B. C.C.*, 148 F.Supp. 698, 700 (S.D.N.Y.1957) (Where a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that ground. Silence constitutes a waiver of the objection); *San Carlo Opera Co.*, 72 F.Supp. at 833. Thus, HSM waived its right to object to Walton and Tobermann as arbitrators.[12]

■ Finally, the mere fact that there was some prior business relationship between Hughes and arbitrators Walton and Tobermann is not in and of itself sufficient to disqualify them as arbitrators. *See Ilios Shipping & Trading Corp.*, 148 F.Supp. at 700. We have held previously that the relationship between the arbitrator and the party's principal must be "so intimate—personally, socially, professionally, or financially—as to cast serious doubt" on the arbitrator's impartiality. *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th Cir.1983).

■ The disclosures of Walton and Tobermann reveal that the business association between Hughes and the two arbitrators was minimal. There is no evidence in the record that indicates that any close association ever existed between Hughes and the two arbitrators and certainly nothing that would give rise to a showing that there was "evident partiality" on the part of either of the arbitrators. "Evident partiality" within the meaning of subsection

(a) of the Federal Arbitration statute means more than a mere appearance of bias. *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 173 (2nd Cir.1984). "As arbitrators are usually knowledgeable individuals in a given field, often they have interests and relationships that overlap with the matter they are considering as arbitrators. The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator." *Id.*, at 173–74; *International Produce v. A/S Rosshavet*, 638 F.2d 548, 552 (2nd Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981).

To set aside an award for arbitration partiality, "[t]he interest or bias ... must be direct, definite and capable of demonstration rather than remote, uncertain or speculative." *Tamari v. Bache Halsey Stuart Inc.*, 619 F.2d 1196, 1200 (7th Cir.), *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980) (quoting *United States Wrestling Federation v. Wrestling Division of the AAU, Inc.*, 605 F.2d 313, 318 (7th Cir.1979)). The record here is completely barren of any evidence of such direct and definite partiality.

## C. *Appellant's Other Claims*

■ Appellant HSM made further claims in its March 21, 1991, Motion for New Trial on the basis of prejudice and bias based on conduct exhibited by Arbitrator Feldman during the first two days of hearings. These claims, unlike the objection to arbitrators Walton and Tobermann, were timely filed, but the court does not believe that the misconduct, if any, amounted to the level of "evident partiality" or misconduct requiring vacation of an arbitration award.

HSM alleged in its Motion for New Trial submitted before the arbitration panel and in its filings before the district court that Arbitrator Feldman directed Hughes during cross-examination to a particular section of the contract so as to supply the witness with a particular answer. The offending passage, proffered by HSM, is as follows:

---

**12.** We note that none of these authorities were cited by the parties. Given that the issue of when a waiver is applicable has been dealt with by other courts on a number of occasions, the court is curious why the parties did not bring this body of case law to the attention of either this court or the district court.

Q. How do you get from 65 to 70? What happened if they hadn't been done if—the explanation's the same?

A. Well, here again, cumulatively billing trying to get to a point where the billing would reflect the amount of work that I had actually done.

Q. (Long pause)

Arbitrator Feldman: Counsel, we're spending a long time on this. I'd like you to take a look at a particular section. Will you take a look at Section 10.3 and see if that alters, at all, where we're going?

The Witness: Subsequent payments for basic services shall be made monthly and/or applicable payment shall be made on the basis set forth in Subparagraph 11.2.2. That's essentially what I was doing.

Mr. Oetting: I'm going have to object to that interruption to my questioning.

Arbitrator Feldman: You certain can—

Mr. Oetting: And that has nothing to do with what the answers that he's giving to my questions are. He hasn't come with that once. He is explaining this on the basis of the amount of work and referring to drawings and what was done at particular times. And, as you know, from what the opening statement was, the basis of our defense, here, is that he did not do this right. He made errors, gross errors. He performed negligently from beginning to end.

Arbitrator Feldman: All right. Proceed.

Mr. Oetting: And this is further evidence, in my opinion, of it.

Arbitrator Feldman: All right. Proceed.

Mr. Oetting: With that interruption, I assume that we are not explaining ...

Appendix, at 195–96.

First, as the Appellee observes, it is evident from the transcript that early on in the hearing the parties agreed to allow the arbitrators to ask questions. The transcript is quite clear on this point.

Arbitrator Tobermann: I've got another question. I've got to get something straight.

Mr. Rolf: Okay.

Arbitrator Tobermann: Are we gonna be allowed to ask questions as we go?

Arbitrator Feldman: That's what Mr. Walton said. I come from a different perspective because of being a practicing lawyer and—do you have any objections (indicating to Mr. Oetting)?

Mr. Oetting: No. They can ask whenever they want.

Arbitrator Feldman: Do you have any objections, Mr. Rolf?

Mr. Rolf: No, I don't, at all.

Arbitrator Feldman: Gentlemen, I think it's gonna be the easiest if you ask questions as we go along. So, just feel free to interrupt the counsel. And I don't have any. Don, do you have some?

Appendix, at 21.

Second, there is nothing apparently prejudicial about an arbitrator wanting to get to the essence of an issue before the panel. This matter came before the Court of Appeals of the Second Circuit in *Ballantine Books, Inc., supra,* 302 F.2d 17 (2nd Cir. 1962) and before a district court in New York in *Catz American Co. v. Pearl Grange Fruit Exchange, Inc.,* 292 F.Supp. 549 (S.D.N.Y.1968). In *Catz American Co.,* the appellant, who was seeking vacation of the arbitration award, contended that one of the arbitrator's questions, interjections, and summaries during the course of the hearing showed a disposition in favor of the opposing party. The Court refused to vacate the award and cited *Ballantine Books Inc.,* 302 F.2d at 21, on this point.

[The Chairman's] conduct of the hearing was wholly consistent with those standards of informality and expedition appropriate to arbitration proceedings. Indeed, we doubt that there would be any reason for questioning his actions had he been the judge at a trial in a district court. A judge is not wholly at the mercy of counsel, and would be remiss if he did not participate in questioning to speed proceedings and eliminate irrelevancies. [Citations omitted] *A fortiori* an arbitrator should act affirmatively to simplify and expedite the proceedings before him, since among the

virtues of arbitration which presumably have moved the parties to agree upon it are speed and informality.

292 F.Supp. at 552 (quoting in part).

It is apparent from the transcript that Arbitrator Feldman wanted to find out under what arrangements (e.g., time period, amount, etc.) Hughes was to be paid. There is nothing inherently prejudicial in this question such that it would appear to rise to the level of "evident partiality".

 HSM also contends that another instance of prejudice occurred when its counsel, Mr. Oetting, attempted to offer a motion for directed finding or summary judgment at the close of evidence. The transcript colloquy provides the following:

Mr. Oetting: I'll have a motion I want to make.

Arbitrator Feldman: Go ahead.

Mr. Oetting: Make a motion for directed finding or summary judgment.

Arbitrator Feldman: I'll adjourn with these two fellows and explain what you're doing and then we can come back and give you our response.

Mr. Oetting: Can I say something about this?

Arbitrator Feldman: You can, but I've been around, I know what the response is going to be. No different than the response would be if you were in a trial court.

Mr. Oetting: Okay.

Arbitrator Feldman: There is no way—I'll explain what the motion is, but your standard, there is no evidence in support and that's just—

Mr. Oetting: No evidence or didn't carry the burden.

Arbitrator Feldman: Well, okay. He either has—he's got evidence as far as I'm concerned to a significant, sufficient enough to make a prima facie case. The question is during the course of your cross-examination have you rebutted his prima facie case to his case in chief and the answer to that is no.

Mr. Oetting: That shortens that up. I'm going to tell you for the record I object to the treatment of that. That's lawyer to lawyer and advocate to—

Arbitrator Feldman: I will explain. I'm only one person. You have—

Mr. Oetting: You have already told them what the answer is. I haven't even made the motion. You haven't had a chance to hear what I have to say.

Arbitrator Feldman: Fine. Go ahead.

Mr. Oetting: The bell has rung.

Arbitrator Feldman: Off the record. (Whereupon an off the record discussion was held between all parties.)

However inappropriate it was of Arbitrator Feldman to cut short Mr. Oetting from offering the motion, the question the Court must address is whether the conduct violated any of AAA's Rules or 9 U.S.C. § 10, the Federal Arbitration Statute.[13] It is clear at the outset that there was no violation of the Rules in this respect. Sections 12 and 19 of the Rules, in which the only reference to bias is made, refers only to an arbitrator's financial interest in the outcome of a dispute or personal or business relationship with a party, and no claim has been made that any of these conditions existed in this case with regard to Arbitrator Feldman. Thus we are left to a judicial assessment of the fairness of the conduct of the proceedings, based upon our own reading of the transcript of the arbitration hearings.

At the time Arbitrator Feldman expressed his personal view about the suc-

---

**13.** § 10 states in full:

In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

cess of Mr. Oetting's proposed motion for directed finding or summary judgment, three days of hearings had transpired and both sides had completed their case in chief. A similar situation arose in *Ballantine Books, Inc.* where the Court of Appeals held that the expression, by a particular arbitrator, of his views did not comprise prejudicial misbehavior nor evident partiality.

It is to be expected that after a judge or an arbitrator has heard considerable testimony, he will have some view of the case. As long as that view is one which arises from the evidence and the conduct of the parties it cannot be fairly claimed that some expression of that view amounts to bias ... While it is better in most cases for arbitrators to be chary in expressing any opinion before they reach their ultimate conclusion ... it does not follow that such expressions are proof of bias.

*Id.*, 302 F.2d at 21.

In the instant matter, Arbitrator Feldman expressed his view that counsel for Hughes had presented evidence of sufficient materiality that would preclude him (Feldman) from voting to grant HSM's motion. At this point, there were more than 450 pages of transcribed material before the arbitrators, and there is nothing to suggest that Arbitrator Feldman's view arose from anything other than the evidence that he had heard during the three days of hearings. While it would have been better had Arbitrator Feldman not expressed his own views at this point, we do not believe that by doing so that this amounted to biased behavior or evident partiality. Furthermore, there is no evidence that Arbitrator Feldman expressed any personal view about which party he believed should ultimately prevail in the case even if HSM's summary motion was offered and denied.

Finally, Appellant HSM alleges that the *quantum meruit* amount of $11,-427.00 awarded to Hughes was contrary to law in that the amount sought by Hughes in the arbitration action was on the contract and not under the equitable doctrine. It is not clear to the court that an award based solely on the contract was the only basis upon which the arbitration panel could have determined an amount to compensate Hughes. In any event, to vacate an arbitration award for manifest disregard of the law, there must be something beyond and different from mere error in law or failure on the part of the arbitrators to understand or apply the law; it must be demonstrated that the majority of arbitrators deliberately disregarded what they knew to be the law in order to reach the result they did. *Sidarma Societa Italiana Di Armanento Spa, Venice v. Holt Industries, Inc.*, 515 F.Supp. 1302 (D.C.N.Y. 1981), *aff'd*, 681 F.2d 802 (2nd Cir.); *Shearson Hayden Stone, Inc. v. Liang*, 493 F.Supp. 104 (D.C.Ill.1980), *aff'd*, 653 F.2d 310 (7th Cir.) (Arbitration award may not be vacated for "manifest disregard of the law," or as "fundamentally irrational" unless there was failure to decide in accordance with relevant provisions of law and not mere error in interpretation of law.) There is no evidence in the record or offered by HSM that satisfies this standard.

For the foregoing reasons, the judgment of the district court is AFFIRMED.